May it please the court, Timothy Berg of Fenimore Craig on behalf of defendants' appellants, I'd like to reserve five minutes for rebuttal. This case arises from the district court's enforcement of a decree apportioning surface water rights to the Gila River against appellants who are not parties to the decree and weren't privy with any party to the decree. For at least 40 years, appellants and their predecessors used wells located thousands of feet from the Gila River for domestic water and to irrigate their farms. This water was presumed to be groundwater under Arizona law. Five years ago, Appalachia filed a current complaint in the district court claiming appellant's water was subflow of the Gila River. The district court agreed and shut off appellant's wells, effectively terminating their farms. The district court erred, one, because it enforced a consent decree over a non-party and over a matter where the state's general stream adjudication had prior exclusive jurisdiction. It failed to follow Arizona law on the burden of proving that a well pumps appropriable surface water into percolating groundwater and granted summary judgment despite the existence of genuine issues of material fact. Three, it issued an injunction that exceeded that necessary to remedy any potential appropriation of water of the Gila River and unnecessarily infringed upon appellant's right to pump groundwater. I'd like to start with a jurisdictional question. The other side, your opponents claim that the district court has exclusive jurisdiction based on the equity decree. Your position is that there is exclusive jurisdiction in the adjudication court and state court. So both of you have staked out positions that there is exclusive jurisdiction. In this case, you seem to agree that there is exclusive jurisdiction. You just disagree where that courtroom is. Now, let me ask about the middle position. If I disagreed with the other side that the equity decree provided a basis for continuing exclusive federal jurisdiction and I disagreed with you that the adjudication court had exclusive jurisdiction over all matters involving Gila River and its tributaries, is there jurisdiction in this case, federal jurisdiction? I think the answer, your honor, is that there would be concurrent jurisdiction. Our position is, as you noted, there's exclusive jurisdiction. But there would be, at least in theory, concurrent jurisdiction. Concurrent jurisdiction in the federal court? In the federal court and in the state court. So that would be either a 1331 or a 1362, and maybe it doesn't make any difference these days whether it's 1331 or 1362. That would be consistent with Judge Bolton's prior order. Yes, your honor. Okay. However, that ignores the fact that in 2007, an order was entered in the state court litigation and upheld by the state supreme court. And in that order to which all the parties in the adjudication, including the community and the tribe are parties, the court held that as to disputes between parties who have decreed rights under the global equity decree, the federal court has jurisdiction, is the forum. As to claims against non-parties, people who don't have decreed rights, the state court, the state adjudication court is the appropriate forum. And so if there is concurrent jurisdiction here, and we obviously believe we have our exclusive jurisdiction, but if the court concludes there was concurrent jurisdiction, that 2007 judgment, which binds all the parties, would indicate that at least as to claims against my clients who are non-parties to the decree, that belongs in the state adjudication court, which is the better court because of the other reasons we raised dealing with the determination of the subflow zone and the entire adjudication process. What claim does your client have, and I have trouble with this because subflow and groundwater and I'm out of my element, and it doesn't strike me as very scientific, and everybody seems to concede it's not scientific, so bear with me as I try to muddle through it. But I don't understand how your client could have a viable claim to Gila River subflow water, particularly given the dates, the community and the tribe have dates that are certainly senior to any claim to be asserted by your client, don't they? It is our position, Your Honor, there is a genuine issue of material fact as to whether we're pumping subflow at all. Oh, I get that. Our position is we're pumping groundwater. But if you're pumping subflow, and that's what the federal court adjudication is aimed to speak to, I'm just, I understand the legal argument, but in reality, could your client have any claim to be entertained by the federal court with regard to Gila River and subflow, including subflow, I'll stop saying that from here on. Let me try to answer it a little different, Your Honor. Our parties have claimed they have rights to pump groundwater. They've alternatively filed claims in state court for pumping from the Gila River. But what rights could they possibly have to Gila River, given the dates of the community and the tribe's rights? Your Honor, if you look at the Nevada cases, the Ore Ditch and the Alpine cases, after the decrees were entered, parties were still able to assert rights to surface water. Why? Because the amount of surface water in a river varies from year to year. My clients may claim surface water rights junior to the surface water rights of the tribe and the community, and in some years that may be worth nothing, but in some years there may be enough water they have rights. But the answer is the right place to determine that is the state court general adjudication. The problem you have operating outside the adjudication is exactly what's going on here. You have two sets of people who have some set of rights to this river, but you don't have everybody who has rights to this part of the river in here, and we're attempting to allocate rights between them without having the parties in front of you. That's why Congress passed the McCarran Amendment. The idea was to say general adjudications by state courts are the correct way to determine water rights in the West. Maybe in the East where there's plenty of water, no one cares, but here in the West we have to adjudicate water that way, and the right way to do it is to get everybody in, give notice to everyone who could possibly have a claim, which the School of Equity Court didn't do, but the adjudication court did do. Well, could do, hasn't done, and appears to be many years away from actually doing those claims. Pardon me, I didn't mean to interrupt. It has given notice to everyone, it has permitted people to file claims, it is working its way through the adjudication. I suggest to you that there are at times federal and state cases that take a long time. The examples I can think of in federal court would be the Pasadena School District desegregation case or the fishing rights case in Washington that Judge Bolt sat on that I think was decided back when I clerked for Judge Chambers almost 50 years ago. The fact that a case takes a long time doesn't mean someone ought to be able to go to another court and ask that court to intervene in the process of that case. I hear your argument, I also don't see the state court trying to elbow the federal court out of the way. The state court, state supreme court seems to have recognized the federal adjudication and we've got a practical problem here, so I hear you, but I'm not sure I'm persuaded. Well, your honor, you have a practical problem either way. I mean, if you uphold this injunction here, you're basically shutting these folks' wells down completely and shutting these farms down completely. Well, there are lots of issues before we get to that point. You've been talking about the claim that the state court has prior exclusive jurisdiction and I'm not buying it. It does, your honor, if you read Alpine and even if you read Judge Bolton's order, what Judge Bolton says and what the Alpine courts say is that the res here is the party's claim. And I'm just suggesting that you've heard from me, you've heard a hint from Judge Bybee and it may be there are other issues you'd like to spend your time on. Well, your honor, let's move to the question of whether... Let me ask you a question on this jurisdictional issue. So, because you're arguing that the state court has exclusive jurisdiction, I'm assuming you're going to disagree with what I'm going to say next. What if the result is that the federal court process has jurisdiction over the main stem, the Keelah River, and the state court adjudication process has jurisdiction over the tributaries? You're right. I do disagree with that, your honor. First of all, it's clear that the state court adjudication was intended to cover the entire Keelah River, including the main stem and the tributaries. It started in 1981? Sometime in the late 70s, I believe, your honor. I don't have the date right at hand. And the globe equity decree and that litigation began in 1925. Yes. The decree was entered in 1935. But it doesn't... The question of what the state courts have to do with the globe equity rights is different than the question of whether they have jurisdiction. Under the McCarran amendments, the state's general adjudication process has jurisdiction over the claims rights here. In fact, these folks, I believe, have filed claims in the state court adjudication. There have been parties to it. What the state is obligated to do, both by state statute and I think as a matter of law, is recognize the rights that the globe equity decree gave to these folks. So the state can't say the federal government, the district court gave you 10,000 acre feet and we're going to decide it's really 5,000 acre feet. The state court has to recognize that. But the state court under the McCarran amendment has jurisdiction to decide my client's claims because my clients have never been a party to the globe equity decree and are pumping water thousands of feet from the Gila River and the state court has exercised jurisdiction over that claim. Even if we were in federal court, there are genuine issues of material fact that preclude summary judgment in this case. First of all, the question of what... If you look at the testimony of our expert, Dr. Lipson, what he testifies to is none of the three wells are in the saturated, people call it the saturated FHA, and that none of them are pumping river water. And that in fact there are the presence of clay layers, which is what would keep water from the river from coming up to the well, in the wells. That is sufficient in and of itself to create a genuine issue of material fact and Judge Rash erred in granting summary judgment on that basis. Didn't your experts report acknowledge that there was a certain percentage of water pumped into the wells that was either from the saturated FHA or from surface water? We had two different sets of experts. Dr. Lipson was the one who testified about the clay layers in the well. CCA report said that there is some percentage on three of the four wells, not the fourth one, that may have originated in the river. But if you look at the southwest cotton case, which is the one that defines what subflow is, it says not all water going into or coming out of the river is subflow. Subflow and surface water is something different. Part of what comes out of the river and ends up in the groundwater aquifer isn't surface water anymore. It's not subject to prior appropriations rights. It's not subject to decree. Finally, I'm going to take my last couple of minutes and try to save some for rebuttal. The injunction in this case is wholly overbroad and wholly inappropriate. If there is at the very least, we contend there is a material issue of fact about whether my clients are pumping any surface water, but there is at the very least a genuine issue of material fact about whether they are pumping more than a minimum amount, a de minimis amount of river water. And what the court did here was enter an injunction, shine the wells off completely. And that's inappropriate. First of all, it should have looked to Arizona state law because this is a substantive water law matter. But secondly, even under normal circumstances, what a court should do in entering an injunction is to enter the least restrictive injunction possible. And what did you suggest to the district court that way? We suggested several different kinds of mitigation. We suggested that we pump some water back into the river, whatever percentage of what we were taking out. When did you suggest this to the district court? Your Honor, I believe we suggested it at the time that the motions were argued. I wasn't the lawyer arguing that, so I can't give you a specific date. I saw the mitigating suggestions in the CCA report. But the district court doesn't mention any question of mitigation. I couldn't, I didn't see anything. I didn't see, I saw an argument that it was overbroad in your opening brief, but it didn't suggest that mitigation had been recommended and rejected by the district court. Your Honor, I guess, first of all, my position would be even if we didn't specifically recommend particular types of mitigation, the district court still has an obligation not to enter an overbroad injunction. And this injunction is overbroad because it shuts off all of my client's rights entirely. There were several different kinds of mitigation. Payment, putting water back in the river, pumping less water, pumping it less frequently. All of those were possibilities that the district court could have entertained and did not entertain. It took the position that basically... And you think that you did or did not brief those questions to the district court? I believe they were raised with the district court. I do not know whether they were briefed as such, Your Honor. Raised in... Either in the course of the argument. I don't have a specific site. Frankly, I didn't expect this question to come up, so I don't have a specific site to give you. I can get back to you after argument with a site to the record somewhere. Because this seems pretty fundamental to me. I mean, my review of the record, starting with the jurisdictional question, the question that I originally started with, going to the question of the merits of summary judgment, and then finally to the question of the injunction, looks like the two parties were about as far apart as you could possibly get. This was a no-holds-barred, all-or-nothing argument on both sides. It didn't look like there was any moderate middle. And so my problem with the argument now is that it feels like it's a Johnny-come-lately. That is, now you've lost it. Well, gee, now we'd like to have mitigation. But if you didn't come before the district court, it's hard to fault the district court for not making up things that weren't presented to him. I guess, Your Honor, I would disagree with that. I think what the district court did was adopt a statement Judge Bolton made earlier, which is the remedy for mispumping is to shut the well down. And I don't think the district court went beyond that. I think the district court had an obligation to look at the record in front of it and decide what the appropriate remedy would be. Certainly, I think we raised it. But even if we didn't, I think the injunction's overbroad and it was an abuse of discretion and the court can... The other thing I want to point out on the injunction is the balance of hardships. Essentially, my clients end up with their farms being shut down entirely. And that's a hardship that I don't think the district court took into account at all in setting this injunction. I see I have about three-and-a-half minutes left, and I'd like to save those for rebuttal. We'll let you save that time. But when you're scouring the record, we have the briefing before the district court. I'm not certain. I can't recall now if we have any transcripts of what happened at argument. If it's in that argument, that would be helpful to know. And we will find that out. And like I say, I can't because I honestly never did look at that particular question and honestly wasn't the one they did the hearing. I can't tell you for sure. I will verify whether we did or not and get back to the court. Absolutely happy to do that. Thank you. All right. So, Mr. Shaw, I understand you're going to go for 15 minutes. Yes, Your Honor. May it please the court to speak, Shaw, for the Gila River Indian community. If the 1935 Globe Equity Decree means anything, the district court must be able to exercise continuing jurisdiction to enforce it against those who take Gila River main stem water without any right to do so. Under defendant's view, the district court is powerless to stop even avowedly unlawful pumpers of scarce main stem water despite interfering with decree rights. Instead, they say decree right holders, like the Indian tribes here, must go to the Gila River adjudication state court for hypothetical relief that undisputedly is many years, if not decades away. That eviscerates... How do you get a consent decree, which is a contractual matter in which you have named parties and now you have non-mutual offensive collateral estoppel? And I don't think that's a particularly viable principle of law. Sure. So, Your Honor, water rights adjudications are unique. So, if you look at the Alpine decision and the state engineer decision from this court, those are also technically in personam decrees like this one. But what this court says, it says in black and white, whether it's in personam, quasi in rem, in rem, they are in the nature of in rem proceedings and that's why the court applies. But quasi in rem always has a limited number of folks. So, whether we classify the equity decree as having been in personam or quasi in rem doesn't get to the question of in rem. In rem must be noticed against the world. It would bind all of the predecessors who owned this property. And they could have done that. They didn't do it. Now, what I do think that you have is that you have probably a very, very well-established water rights in the tribe and one that surely is going to stand up as the prior appropriator. That means that the question is who's going to have rights to the water running adjacent to the defendant's farms is not going to be a difficult question. Right, Your Honor. And there's no reason why the federal district court shouldn't have jurisdiction over that question when we're talking about the water rights. But the question of exclusive jurisdiction is a very, very powerful tool. I'm going to put the same question to you. If I don't accept your theory and I don't accept their theory, does the district court still have jurisdiction? Yes, it does. 1331, 1362, it's certainly a federal question because it implicates the allocation of water rights. And could the United States have brought this suit on behalf of the tribe? Yes, the United States, in fact, the United States has brought a parallel. That's a very simple solution to the question of jurisdiction. Now, the question of exclusive jurisdiction also presupposes some kind of collateral estoppel that I probably am not willing to assume. Okay, so obviously the court doesn't have to go to exclusive jurisdiction, right? The federal court clearly had jurisdiction at least under 1331, 1362. It was Judge Bolton and Judge Rash disclaiming their argument of prior exclusive jurisdiction in the state court. And what we know, at least, is that has to be wrong. The federal court exercised jurisdiction over the body of water. Again, I think under Alpine and state engineers, that's exclusive, but you don't have to go that far. They at least exercised it in 1935, before the state court adjudication even existed. That wasn't until 1980. So it can't be that this state court has exclusive jurisdiction over the Gila River main stem. I think Judge Beatty, you got that. Both sides are arguing that somebody has exclusive jurisdiction. And I suspect it's because of things going on beyond this case. For our purposes, and you seem to acknowledge, the federal court had jurisdiction. It may be concurrent, but we don't have to resolve it. You don't have to resolve that to affirm the district court here. Because the question is whether it's jurisdiction. This came up because they made the prior exclusive jurisdiction argument in Gila adjudication. Judge Bolton rejected that in saying that no, actually, the federal court has exclusive jurisdiction. You don't have to go that far, obviously, to affirm the judgment. And Judge Beatty, you got it exactly right. There's a line to draw here between Gila main stem water and all of the other tributaries, which are major rivers, actually, in Arizona, that the Gila adjudication has spent decades. It's been 45 years, and it's still a decade away from even getting to the area that's at issue here. Again, nobody knows that better than Judge Bolton, who actually was the presiding judge of that Gila adjudication state court. It was Gila 6, the Arizona Supreme Court, decision that drew that distinction between main stem, federal court, and other things, tributaries, other rivers in the state court. But I agree with you, Judge Bybee, Judge Clifton, all you have to decide is that the federal court had jurisdiction here. And there's no, the only way they could dispute that is by saying the state court had exclusive jurisdiction. And that can't be right. By the way, there is an unbroken line of precedent from this court, the Ninth Circuit, dating back to 1980 in the Smith case, where the federal court adjudicated claims exactly like this, that is, decree right holders bringing enforcement of the decree against unlawful non-decree parties for unlawful pumping of main stem waters. That's in Smith, and this court says in Smith, that's a 1980 decision, that all agreed that if, in fact, it was found that the non-decree party was pumping subflow, pumping main stem water, that there could be injunctive and other relief to shut it down. Then, of course, in 2007, in the resolution of the Hotlands litigation, in ratifying that settlement, you have Judge Bolton, and this is at ER 2223 where the district court talks about Judge Bolton's 2007 decision. I'll just read you what she said in ratifying that settlement addressing exactly this situation here. This is not a new problem. The federal courts have been adjudicating these for decades. She says, quote, the agreement does not in any manner modify the Gila decree, nor would it in any manner inhibit this court from enjoining well pumping if wells are determined to be pumping water in violation of the decree, and this is against, quote, people who attempt to seek legitimate rights to Gila water who do not attempt to seek legitimate rights to Gila river water through the decree. By the way, that document, which is cited in the district court opinion here at 2223, that document comes from the Globe equity litigation. It's document 6595, and it's at pages 5 to 6. It addresses exactly this scenario. Maybe not, because the contention of the defendants is that they're not pumping Gila river water. They're pumping groundwater, and so I understand what you're saying with regard to the extent of the decree's impact with regard to Gila river water. The issue we have here is, in fact, is that going right? I'm just talking about the jurisdiction, right? The allegation is that they're pumping, and then the question is whether they are. So that's the Smith in 1980 from this court. It's Judge Bolton's from 2007. Then you have a decision from 2009 in this court. This is the GVID decision cited in our introduction and at various places in our brief, and at 284, here's what this court says. The district court retains jurisdiction to, quote, protect the rights of all parties to the decree against landowners without rights under the decree who operate wells in violation of the decree, and it cites this 2007 Bolton order that I just gave you. I don't take that as granting exclusive jurisdiction, but as honoring a judgment about prior appropriation by the tribe, which ought to be perfectly good and which I don't understand anybody who's involved in that litigation or in this litigation to claim that they have superior appropriation. And, Your Honor, I'm kind of accepting your premise, right? It doesn't have to be exclusive. These are comments. What we do know for sure is this court has opined that the district court does have jurisdiction to enforce the decree, putting aside whether the state court could also do it. And so all of these things that I've read you, I think, unbroken line since 1980 until now, all of these have always been litigated in federal court. We know that it's been endorsed by Judge Bolton, endorsed by this circuit. You don't have to go so far if you're not comfortable to say it can only be in federal court, but certainly that's basis to affirm the judgment here. If I can pivot to the merits, Judge Clifton, about whether they're actually pumping subflow or not. There was an extensive record here. I want to point to two pieces of evidence that the district court in particular relied on. That evidence, just to show there's no material dispute of fact, it comes from their side's experts. Because time is going by, let me make clear. I've got serious concerns as to two things. Let me identify them and you can speak to them. One is whether, in fact, there is a basis for summary judgment because of the lack of genuine dispute of material fact. It seems to me as I read this, this sure didn't look much like a summary judgment case to me. And our review at this point is de novo. And I'm not sure that the district court's analysis of the evidence is something that would necessarily have to be accepted by any reasonable fact finder. So that's one concern. And the second particular concern is the utilization by the district court of what I'll call the Judge Ballinger assumption. Which, as I understand it, the state adjudication court used that to determine jurisdiction as to whether this particular court, which is actually a Maricopa County court extending outside of Maricopa County, the jurisdiction of that court is a very preliminary decision. And I see nothing that supports applying that assumption, the reasonableness I get, but nothing applies that as a rule of decision for the merits. And so the assumption that's been applied here, taken from the state court for jurisdictional purposes, is applied here as a merits rule of decision. I don't see the support for that and don't understand how the district court can justify its decision on that basis. So those are my concerns. Speak to it. Yes. Let me start with the first one, which is the evidence. I know obviously this is a technical subject matter. There is a lot of evidence thrown at you, but the district court cut through that by taking their own experts' evidence, which is why there's not a material here.  Well, you're using their evidence, but let me point you to it so we're not talking in abstract terms. ER 382, my friend on the other side said the CCA expert report, this is their expert report, he said it may not have, some of the water may have originated from the Gila River. That's not what the expert report says. Here's, and I'll quote it to you, ER 382. It says, the sources of water were tagged with a numerical value in the model to determine the percent of water that was reaching the well directly from the Gila River. And it found there were certain percentages of water reaching, being pumped by the wells, quote, again, directly from the Gila River? Well, that's the result of what I understand barely to be 100-year modeling, not a study of the actual locations. That's what I understood the CCA report to be. Now, can you point me to something that says CCA was actually analyzing specific conditions at each site? Well, Your Honor, they created this model to model the wells at issue, the four models, and that's why they came up with different percentages of how much water was coming directly from the Gila River for those wells. I mean, that's why they hired the experts, to show how much water was coming. Their strategy was to show it's only a small percentage and then propose mitigation in that expert report, which they do at ER 382. It wasn't an alternative. Dr. Nibson, the hydrologist, at least said he studied conditions at each location and came up with different conclusions, and at least one of the CCA analyses suggested that there was a well where the figure was zero. Right. So how do we get some rejection out of this? So for the three wells, Your Honor, this CCA report, their own experts say it is pumping some amount directly. I don't read it that way, but you can so argue. Okay. That's the three wells. The fourth well, there's a second piece of evidence that the district court relied on, and this is at ER 861. This is, again, from Bartlett, one of their experts, who says Sexton – so the first three wells in that CCA report are Shoebrook, Sexton 1, and Sexton 2. The second piece of evidence covers Sexton Wells 1 through 3. So between those two pieces, that's all four wells at issue. What that says at ER 861 is it says Sexton Wells 1 through 3, it agrees, all of them lie within the FHA, and that is the zone, the subflow zone of presumptive pumping of subflow. So you have their expert at 861, which they don't dispute on appeal, admits that those three wells lie within the FHA, and they contrast that. Again, my hold of the science is really tentative. My understanding is that if it's within the FHA and it's determined to be saturated, that's one thing. I did happen to look at this, and I didn't see it. So the saturation point comes up because that is a presumption that the Arizona Supreme Court in Arizona 4 said, okay, you have the FHA. As you said, the saturated FHA is going to be the subflow zone. It has now been years where the Arizona Adjudication Court, and no one has appealed this to the Arizona Supreme Court, even though they have the right to do so from the Adjudication Court. They have been applying the saturation presumption that ADWR, the state agency that they want to defer to, has suggested, and that's because it's impossible. You couldn't do an actual analysis at any time because the water table changes. The amount of water at any given time might change based on the amount of pumping. And so there has to be, to make this test workable, there has to be a presumption of saturation. And then it's up to the other side, here the defendants, to show that there is some impermeable layer that prevents the pumping. They did not come close to that in the record here, and the district court marches through that evidence at ER 46 through 48 to show there was no impermeable layer. The best they can come up with is Lipson, the expert that you referenced, says, I looked at the drill logs and there's references to clay. Well, there is, of course, clay in the FHA alluvium. Alluvium is built with all sorts of materials. The question is, is it an impermeable layer that prevents pumping? That's their burden to do once you show it's within the FHA subflow zone. It's their burden once the plaintiff is established by clear and convincing evidence that more than groundwater is being drawn. And the district court appeared to check off that box by applying the assumption that Judge Ballenger used as a question of jurisdiction. Yes. That's the second problem I raised, and I haven't heard an answer. Oh, so the burden, you're right, a burden shifts in the saturation presumption. Let me try to be direct in answering the saturation presumption. That comes from ADWR in the HEAL adjudication. The HEAL adjudication has been applying that saturation presumption. That's accepted Arizona law now. It has not been appealed to the Arizona Supreme Court. It's not just Ballenger. It's been applied in the Verde, I think the San Pedro, the other tributaries. It's been applied. That's the presumption, and the reason that's explained there is because there's no other way to analyze it because the water level changes from time to time. It might be saturated at any given moment but not at the other, and that's why there's this saturation presumption because otherwise a court couldn't actually determine for each respective site whether it's within the subflow zone or not. So the ADWR said is once you have an agreed upon FHA, that is assumed to be saturated. Burden shifts to the claimants to show that there's an, and this is straight from HEAL-A-4, quote, all wells located in the lateral limit, this is an Arizona Supreme Court decision, of the FHA subflow zone are covered unless well owners prove that perforations are below an impervious formation which precludes drawdown from the floodplain alluvium. That's at HEAL-A-4 1076. They haven't shown that impervious formation, and again, this is all the sites. I know it's complicated, but it's worked out at ER 46, 48. The best they can do. That wasn't their focus in the district court. That's why they don't have evidence of that nature that walks through and shows that there is an impervious layer. They just haven't met that. You can ask them what's their best evidence for an impervious layer. It's not. They have well logs, drill logs that say maybe there is a clay layer here. Nothing that shows that a jury could, or not a jury, but the fact finder after trial could rely on. And so if you just look as the district court did at their own expert evidence, I don't think you could find a triable issue of fact when it's the three of the wells, their experts say it directly pumps from the Gila River, and then as to the fourth well, you have their experts saying it's within the lateral limits of the FHA, which then pushes the burden to the other side. I know I'm past my time. Can I address one? I would like to address the injunction, the question of overbreath. Yes. So that was the argument they raised, Judge Bivey, at the remedial stage, that it was overbroad. If you look at their opening appeal brief, they raised the same argument. The word mitigation doesn't appear in their opening appeal brief in the remedy section. But they are certainly related. Yes, they're certainly related. But just to answer your question, my understanding is that they did not argue mitigation when it came to the scope of the relief, just that it was an overbroad remedy. So they didn't argue these specific things here. There was a motion for reconsideration filed in which they sought, for example, so that they could continue to pump for domestic purposes. And the district court, and we cite the portion of the opinion in our brief, in a footnote says that is forfeited because they didn't raise that argument during the actual proceedings. And you can't raise new arguments in a motion for reconsideration. The last thing I'll say about this is that we're under an abusive discretion standard. When it comes to remedy, the historic remedy for ---- It's just breathtaking, though, that the expert came, that the judge cited Judge Bolton's dicta that the remedy is shut down in a different circumstance. It's a very broad statement. It doesn't feel like a good, salutary principle of law. And we've got 0.56 on the Shoebrook, 0.56%. Your Honor, that's, again, the district court didn't resolve the percentages. It's just that it was pumping. Well, either we take the CAA, the CCA report, or we don't take it seriously. You can't take it seriously for some purposes and not for others. Sure, if you want to accept the percentages there. We don't have anything over 2.5%, any well. Right, but if they had proposed an alternative remedy that would have allowed stopping of the subflow, they don't have an alternative remedy that would stop the illegal taking of main stem water. And that is why the judge ordered the only remedy that would cure the violation. Well, there were things offered in the CCA report. That's the 382. And that wouldn't have stopped the unlawful pumping. If you look at the mitigation steps, again, these weren't argued, to my understanding, to the district court. But what they're talking about is pump less, pump at a lower rate. They did propose returning water to the district. They did. And the problem with returning, as we say in our brief, is that it changes the hydrology. It's not that you can just take water out and then pump it back in. That changes the dynamics and flow of the river. It degrades the quality of the water that's reaching the tribes, the senior users. The tribes are all downstream. That's, again, that's briefed. They don't have a response to that. They didn't raise that on appeal. And so there isn't more extensive briefing on that. But that's how the remedy played out, as we understand it, Your Honor. We're taking over time, but we're allowed to do that. Sure, you're right. Maybe you can get paid extra for it. I don't know. I guess I share Judge Bybee's concern. Why is it all or nothing? I mean, courts are frequently dealing with situations where we can't return people to the place they've been before. We deal with that in other ways. Money winds up being the cure frequently. But even, I think, I bought a house 29 years ago, and it turned out the new surveyor said the old surveyor line was wrong and the carport roof stuck over by three inches. And the automatic remedy isn't let's tear down everything that might cross the line. And given the percentage we're dealing with here, it just seems hard for me to understand that there's not a more practical resolution than the one that the district court has imposed. Again, Your Honor, there wasn't a basis given to the district court to come up with a solution that would actually remedy the harm. The harm is that they're pumping Gila River. And remember, I know Judge Bybee is saying the CCA report, which we rely on, but their expert for the other three wells agreed they all lie in the FHA. The presumption is if you're within the FHA, it's 100%. I've got a real problem with that. Some of these wells are thousands of feet away. And the subflow was supposed to be originally, as I understood it, in trying to read the Arizona decisions, basically kind of right under the bed of the river. So, Your Honor, that's Gila 2. The Arizona Supreme Court came back in Gila 4 and said, no, we're not going to limit that. We're going to make it the FHA. The FHA could be much broader than just what's right under the river. There was years of litigation, Your Honor. It culminated in the Arizona Supreme Court's opinion in Gila 4, and they explained why the FHA, which may seem much broader than what the Arizona Court previously said in Gila 2, is the answer for the subflow zone. And so I'm not saying this to argue with you about what the exact percentage is. My point is, under the Arizona Supreme Court's view of it, the presumption is 100% of the water is coming from subflow for the three wells that lie within the FHA. Well, it's the same decision that says the burden is on the plaintiff to show by clear and convincing evidence that it wasn't just groundwater. Right, and the way they show that is to lie within the FHA. And both sides agree that three of the wells, the three Sexton wells, lie within the lateral limits of the FHA. There is no dispute about that between either side, on appeal or in the district court, ER 861. So under the Arizona Supreme Court's holding under Gila 4, for those three wells, Shoebrook, I agree, they disagree that that's within the FHA, so we have to rely on the CCA report, that first piece of evidence for Shoebrook. But for Sexton, it should be easy for the three Sexton wells. Even for the one where CCA, which you rely upon, says zero? That, exactly, because again— There is some picking and choosing here. Well, Your Honor, it's their expert evidence, right? And it's summary judgment. And you have to establish that there's no genuine dispute of fact. And if you're picking and choosing what evidence to rely upon— Well, Your Honor, I guess my response to that is the presumptive way the Arizona Supreme Court has said is does it lie within the lateral limits of the FHA? Their expert, the only expert who will pined on whether these lie within the lateral limits of the FHA, Bartlett said for the three Sexton wells, they lie within. That's the starting point. I know I addressed it. And you relied upon CCA, which says zero for well three.  And why can't that be argued to be— Because the Arizona Supreme Court doesn't provide that as a method. They made that method up, Your Honor. As a presumption? Well, if it's a presumption, it is potentially rebuttable. Right, but— It suggests that there may be a genuine issue of material fact that the CCA report, which you're relying upon for well four, the other one I can't pronounce— The Shubra. Shubra. Shubra. That if you're relying upon for that, why can't defendants rely upon that same report to say zero for well number three? Sure, because the way to rebut the presumption is to show an impervious formation. That is how the Arizona Supreme Court says you rebut the presumption. And they have not shown an impervious formation. Again, this is the evidence that I mentioned earlier, ER 46 to 48, where the district court carefully goes through all the Lipson testimony on Clay and all of that, and there are well logs that show some Clay, nothing approaching the sort of impervious layer that Kela four said you have to show to rebut the presumption. Sir, I know I am above my time. It's our responsibility. Yes. Happy to answer other questions if there are. All right. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, my name is Joe Sparks. I represent the San Carlos Apache Tribe, and in the courtroom today are members of the Tribal Council, the Vice Chairman, and Alex Ritchie, the Attorney General for the San Carlos Apache Tribe. Just one note on history, Your Honor. This decree is now 90 years old, and it's been operated and managed under a decree for 90 years. The Court has jurisdiction under the decree expressly. As the Court looks to this, as this Court looks at the decree, it began 100 years ago. The only people in this courtroom that's 100 years old, I'm the only one that's 100 years older. So I'm not saying I was there when it happened, but close to it. The San Carlos Apache Tribe is a federally recognized Indian tribe under the 1934 Indian Reorganization Act and under the Apache Treaty of 1852. The action was brought in federal court in equity, Your Honor, because at that time in 1925 and 1935, the federal courts of equity were separate from the courts of law. So it was initiated in equity and in rem, in fact. And so that's the way it was argued, planned, and decreed. The decree is very, very express, explicit. It talks about the waters of the Gila River with an S and the underground waters of the Gila River as expressly. And the decree is structured so specifically as to say who can take water from the underground rivers, underground waters of the Gila River, and everyone else cannot. In fact, it says where every holder of a right in the case, under the decree, can take their water and no other place and no other rate and no other time except under their priority. Now that has been a difficult thing for the two tribes because neither one were parties in the court. They were not allowed to appear in court. They did not get to argue in court or testify in court. The trustee brought this case for them to preserve their federally reserved water rights, among other theories that were before the court in 1935. However, what has happened here is that the waters of the Gila River began in New Mexico, and this decree, whatever you decide, and however it is administered in the future, must be adjudicated and enforced in New Mexico and Arizona because it starts in New Mexico and this court, the trial court, federal district court, enforces this decree in New Mexico and Arizona. So the rules that we need to follow have to be at least manageable under both systems. What I would like to say is that although the two tribes got not what they really deserved under the best days of the early Americans in the West, they got what they have, and we've been told by this court that what you got is all you're going to get, but it is all you're going to get, and for San Carlos with more than 2 million acres of land and for 40 miles of the river running through it, it got 6,000 acre feet of water with a priority date of 1846 and a diversion rate of 12.5 cubic feet per second. It, in the entirety of the decree, has never received the water in the quality, time, and locations that would allow it to divert it successfully and to grow crops of value under the decree. Now, the problem here, then, is that the court expressly reserved its jurisdiction to enforce the decree under Article 12 and 13 of the decree, and it expressly established a water commissioner, and the water commissioner, the court has a staff, a water commissioner with full-time employees, full-time lawyers, or lawyer at least, and I was one of those lawyers way back in the 1969, 70, 71, and 2. I was one of those lawyers, and so I understand how the difficulty is, and they administer this decree 24 hours a day, even under the criticism from most of the parties, most of the time, because everybody wants more water than is available to them. But it is very interesting that where there is a right to take water from the underground sources, it is expressly set out in the decree, and you can see that in Article 8 and 9 of the decree for what was an early underground waters of the Gila River below Coolidge Dam. Now, it's odd that these two tribes come to you from earlier jurisdictions under Spain and then Mexico and then under the laws of the United States for territories, and the Gila River was a dividing point in the dispute between Spain and the Eastern American governments at that time, and both reservations straddle now the Gila River, and both reservations have earlier rights than any of the claimants here or anyone else under the decree. So when we get to the point where the U.S. Supreme Court in Arizona versus California took a look at the Gila Basin in Arizona as one of the issues among the lower basin states to be adjudicated and found that the Gila River was so over-appropriated by the Globe Equity Decree and by other takers of the decrees on the tributaries, some of which originate in Mexico, that it was not going to adjudicate that in Arizona versus California. Those who asked or inquired about it were told in 1963 in Judge Rifkin's discussion that you're going to have to go to the court that has jurisdiction over the mainstream of the Gila River. It's the mainstream of the Gila River and its waters and the underground waters of the decree. Now, when the opponents talk to us about this, everybody, nobody in Arizona has enough water except in certain country clubs, swimming pools, seems like they have enough. But we don't have enough in San Carlos, and we never get the water right that we have. And one of the reasons is because it is pumped until it caves in. I'm a country boy from Missouri and Mississippi River, so it's hard to think about the Gila River as a river, as a big river, but it's international in scope, interstate in scope. And the bottom line here is that it was over-appropriated. There's no more to be had. And the appellants have other remedies about water. They can haul the water for their horses and they can haul water for the gardens and things like that and tankers. That's what I do. I haul water to my water tank. There's just not enough water everywhere. And if you don't have a municipal supply or an early appropriative right, then you don't have it. I'd like to speak one moment about the remedy. The remedy for these folks, if they wanted to continue their well instead of doing the Joe Sparks approach, haul it with water tank, would be to acquire an adjudicated right from a specific landholder under the decree and move the court to sever and transfer that right to their wells. And that's what Judge Kuhnhauer explained in 1992 and later in 1996. He adopted rules for that process. The severance and transfer of water rights and decreed water rights under the decree. And it is being followed now in multiple, dozens of cases that we are adjudicating and have worked with other parties, adverse parties in the decree to get done. So under the decree, there are different measures that they can take other than pumping more water and giving some of it back. It's sort of like just taking a little bit of money out of your bank account by somebody and vesseled it. Say, well, I'll give you back the interest. How about that? And that's not the way the river works. Rivers flow from the bottom up. If they have no base flow, when there's a precipitation of it, the water flows into the subsoils of the river and surrounding the river until it is saturated to the point that it can't maintain flow that you can see above the bed of the river. And when the river is dry or nearly dry, as it has now been for nearly 10 months in Arizona, it flows at very low rates. And unfortunately, a substantial amount of that flow is from sewer discharge from the upper valley communities upstream from San Carlos. It's unfortunate that's the case. But however, the flow that is not from those discharges is from the subflow of the river and the banks of the river discharging back into the river so that it has enough hydrologic support to support the surface flow for those who can only take from the surface, which is by far an enormous majority of the parties in the decree. We looked at the original jurisdiction and the interim jurisdiction carefully, and the district court judge looked at it as well. The decree is so comprehensive. The resource is so over-appropriated. There's no way for somebody to get a new right out of the river by any means whatsoever except by purchase of an existing and the earliest rights you can purchase and hope that the river comes to you when it's time for you to use it because most of us, and the Apache tribe is one, has to take its water as it flows by. The tribe's right to take water is from the natural flow of the river. And Judge Coudar's mentioned in one of his 1996 order establishing a water quality injunction for the benefit of the tribe that at that point most of the flow was agricultural drain water. It was not natural flow. The tribe hopes and asks this court to enforce the remedy so that natural flow can appear in the stream and so that it can divert its natural flow according to its right. The tribe absolutely for 90 years has obeyed this decree, and for 90 years it has been abused by not being able to get the water as it's supposed to get in its order of priority. The unfortunate part of this is that the old joke in Arizona about it's better to be upstream with a shovel than downstream with a right reflects the same thing with a well. And I understand the court's interest in the science of this river and the science of what's called subflow. And this court mentioned that reference in U.S. v. J. Smith in 1980. In footnote three, this court mentioned in denying the appeal of the United States in that case, it said, you know, bring us a case where there's somebody pumping water from the waters of the Gila River and bring the science with it to support it so that we will look at that and enforce it if it is the waters of the Gila River and its underground waters. So in that case, the court has been observing that. And each of the trial courts, and I've known all of them since 1961, Judge Wallace, Judge Kutauer for a while, and Judge Bolton, and now the lower court judge, Judge Rash. They have all struggled with this question. And it is science that must prevail here, Your Honors. It has long since passed when we can make believe that everything's going to be all right if you just get along. We can't just get along here because it's perish if you don't have water to support your tribal or human existence. There is no place for the tribe to get the waters that it should get from the Gila River elsewhere in the reservation. It needs that water. It needs the enforcement. And I think it needs sound science to do it. We have no problem with the fact that even if it's considered an admission against interest, that their experts on behalf of those pumpers acknowledge that the waters from three of the wells were coming directly from the Gila River. It's okay for them to argue that while the well itself is argued is maybe 1,000 feet, or they use the plural 1,000, away from the river. But the fact is, even if you use the artificial concept of subclosed zone and the saturated younger Holocene and alluvium, then the easy way to tell if you're there in the saturated Holocene and alluvium and the presumption that Judge Ballenger established for the San Pedro case is to say, drill a well, drill a hole. And if there's water in it, it's saturated and it's a subflow. And if it isn't, then the presumption was wrong. The problem here is they say that they should be able to go to the state adjudication court. I've been in it since the first day. I'm the only guy left standing that was there on the first day. I can't be proud of that. I'm just tolerant of that fact. But the fact is that they misstate the McCarran Amendment. It only waives the sovereign immunity of the United States to be included in a case of adjudication of broad, total, interstitial jurisdictional decision of all the waters under a state command. In Arizona versus San Carlos, the Supreme Court said, well, there can be joint jurisdiction between either court, federal or state, and whoever takes the first initiative has exclusive jurisdiction to proceed, or in concurrent jurisdiction. And here, in this case, in the state adjudication, the federal court yielded. This jurisdiction, this court yielded to the arguments to the state, made by the state, that they should take jurisdiction. But what the jurisdictional consequences of that is that the Arizona Supreme Court decided in Hilo 6, I didn't make up these numbers, but I was involved in all of them, Hilo 6, that it was going to take jurisdiction and had jurisdiction over the tributaries of the Hilo River, and then nodded to the San Carlos Apache tribe, and said, look, you didn't do real well in the Hilo Decree on the main stem of the river and its underground waters, but that's what you got, and so let's make the best of that, and let's do so here. Mr. Parks, I'm sorry to interrupt you. Yes, ma'am. So you're like 12 minutes over your time. So we're pretty significantly beyond time. Could you just conclude your remarks in the next few moments? Yes, Your Honor. Even if somehow the court decided that one or more of these arguments is not within the realm of the decision-makers to make here, you can affirm the final judgment of the trial court based on any defensible and viable evidence before the court, and therefore we ask that you affirm the trial court before and at the judgment at 0006 and 0007 of the ER. Thank you for your tolerance, Jim. Thank you. All right. Mr. Berg, I think the other side went about a total of 25 minutes over time, so I'm not going to say the cost no longer exists, but that's twice what they were allotted, so we're not going to be real strict with you on your three minutes for rebuttal, and as long as we're still asking you questions, you can remain at the lectern and answer our questions. Thank you, Your Honor. I want to start with the question of whether there's a genuine issue of material fact here. The HeLa IV case makes it clear that at the very best their argument is that the subflow zone is a saturated FHA, not just the FHA as Judge Clifton pointed out. Second, as Judge Clifton also pointed out correctly, what Judge Ballinger said is you assume the FHA is saturated not for purposes of deciding the individual merits of somebody's water rights, but for the purpose of deciding whether they're subject to the jurisdiction of the adjudication court. In other words, they can't simply say because a well is located in the FHA, that in and of itself proves that it is pumping subflow and proves that it's pumping subflow. It could still be pumping entirely groundwater in the FHA so long as it isn't pumping, as long as they haven't proved saturation. Second, they have the obligation of proving by clear and convincing evidence that we're pumping subflow. There is at the very least a genuine issue of material fact here found in Dr. Lipson's testimony. Dr. Lipson testified... Mr. Shaw told us that the state adjudication court has been applying, or I understood him to say has been applying that assumption more broadly. That is, it is willing to accept the proposition that if you're in the FHA, that's enough to satisfy the obligation. That's certainly not my understanding, Your Honor. That's not my understanding of what the water court is doing. Do you know if the reference has been to Judge Ballenger's use and the district court's order here acknowledges that his application was for jurisdiction, goes on to say that in the view of the district court was irrelevant, and makes a generalized reference, which I confess I've never really understood, but suggested that maybe in fact that's what's happening in the state. Has there been anything reported that would help me understand how that proposition or that presumption is being treated? Not that I'm aware of, Your Honor. I think if you look at HELA for what it says, it's saturated, but it doesn't say that you assume the entire FHA is saturated. And what Judge Ballenger says is you assume that for jurisdictional purposes. And am I correct in saying jurisdictional purposes is whether the court has authority over this particular case? Right. It's whether the well is subject to the adjudication itself. It's not a determination that it is in fact impermissibly pumping river water. Dr. Lipson's testimony by itself creates a genuine issue of material fact. He testified that the wells were located outside the FHA. And that again creates a genuine issue of material fact as to that, although it doesn't matter if they haven't proven the FHA was saturated. He also testified that clay was present. And I think Mr. Patel, I'm sorry, Mr. Shaw, I apologize, overreaches by saying you have to put in evidence that there's an entire impermissible layer. I think the presence of clay by itself is enough to create a genuine issue of material fact as to whether that clay is preventing subflow from coming up through the river and being pumped by the well. And if there is the presence of clay there, then the trier of fact ought to listen to Dr. Lipson and their expert, Dr. Mock, I think it was, and our folks and determine that. But the fact that there's clay there and the fact that Dr. Lipson says the clay there may indicate the presence of something that stops the water from going up is enough to create a genuine issue of material fact. But if it's not a continuous barrier, it's like you can have a wall around two sides of your yard, but if there's not a wall on the other side, then the coyotes in this part of the world can come in. But if the wall stops me where I'm drilling or the clay layer stops me where I'm drilling from getting to it, it doesn't matter if the clay layer covers the whole valley, Your Honor. And again, that would be a fact question that needs to be determined by the trier of fact. The impact of the clay layer, it seems to me, is a genuine issue of material fact. I understand that, but I also know at the time of summary judgment, the party is supposed to push forward what they have, and it does appear that Dr. Lipson doesn't have something that would support the proposition that there's a layer that necessarily prevents subflow water from getting to these wells. I think what Dr. Lipson's study shows is that there is clay there, and that clay may prevent the water from getting there. It may prevent enough. I think so, Your Honor, for a genuine issue of material fact, sure. What additional evidence would there be for trial? It may well be there'd be additional studies between now and trial. It may well be that Dr. Lipson would testify to more than is in his report. That's why we have trials, Your Honor, particularly in complicated issues of hydrology like this. There's a danger in letting lawyers practice hydrology, but it seems to me that the answer here, as the courts pointed out, is this is an incredibly complicated factual matter. And the question is, at the end, whether these wells pump water that is subflow under Arizona law, and not all water that comes from the river is subflow under Arizona law under the Southwest Cotton case. And then the question is, what percentage is it? And both of those are disputed issues of material fact in this case. And Judge Rash, with all due respect, jumped over those issues and simply said, I'm going to find if there's any water here that I think is river water at all, I'm going to shut the wells down completely. And he both ignored the genuine issues of material fact, what I'll call liability, or whether the wells were pumping subflow, and he certainly ignored genuine issues of material fact as to how much subflow they were pumping and the appropriateness of the remedy. Concurrent jurisdiction. You've read all of our arguments on exclusive jurisdiction on our side and on the tribe side. Let's talk about concurrent jurisdiction for a moment. In 2007, a judgment was entered binding all of these parties, which essentially said, if you are talking about disputes among parties to the Globe Equity Decree, you go to federal court. If you are talking about disputes that involve non-parties to the Globe Equity Decree, you go to state court. Why? Because the Globe Equity Decree cannot bind non-parties. It's a fundamental issue of both, I suppose, race to cotton collateral estoppel, as they called them back in the days I was in law school, and of due process, that you can't bind somebody to a judgment that they're not a party to and where they didn't have an opportunity to present their case. And the problem with the Globe Equity Decree as exclusive mainstay is it doesn't include everybody that should have been included or could have been included, and it doesn't include everybody now. That's why the adjudication is better, because it's a system that adjudicates everybody's water rights. It adjudicates them all at once. It'll establish priorities, each is to the other. Well, I'll hark back to what I was asking you previously, that we have here a river that's kind of thoroughly drained, over-allocated, and we have claims apparently filed by your client in the state adjudication court, but it seems pretty obvious they couldn't have seniority, they couldn't have preference over the claims of the community and the tribe that date back to time immemorial, 1840, whatever. So I hear what you're saying, but is there practically speaking any serious basis upon which your clients can assert that they have rights to heal a river water as distinguished from the groundwater? Well, first of all, Your Honor, the issue to be litigated, I think Judge Bolton pointed this out at some point, is whether we're pumping groundwater or surface water. And that's the main issue here, and your suggestion that somehow in 2007 it was decided that anything involving somebody that wasn't a party to the federal court, even acknowledging it's a consent decree, still has a card to play, I just don't get it. Your Honor, they have a card to play in the sense that they have a right to their day in court. Well, here we are. But they didn't get their day in court. What Judge Rash did was simply enforce the decree again. Lots of people get days in court, but is the day worth anything if you don't have anything but an empty hand? I mean, if their rights to this over-allocated stream are plainly junior to the rights of the other parties that have shares, what are we talking about in real terms? First of all, Your Honor, it has never been established as a matter of fact in this case that the pumping we're doing reduces the amount of water received by the tribe and the community below what they're entitled to. And the main issue for me is the groundwater versus subflow. But your argument seems to be harking back to, and the consent decree can't speak to us, because we never got a chance to lay claim to the Gila River, and I don't see any realistic claim your clients would have to Gila River water. I guess my answer, Your Honor, is my clients are entitled to make their claim in court, whether it's realistic or not. When I clerked for Judge Chambers one day, he let some fellow whose dog had been poisoned come in and argue that the Alameda County attorney had violated his civil rights. And I said to the judge, why are we doing this? And the answer is, he's entitled to his day in court, even if he can't ever win. Yeah, but we live in a real world, and if the day in court is purely theoretical, he may have his day here, but I'm not sure that we should say, let's not pay attention to what's going on. It's not theoretical, because what they want to do is say, you can go, even if you're pumping groundwater, you can go to the, what's happened, Your Honor, here, let me see if I can explain this. My clients are now precluded from pumping groundwater. Everybody agrees that as a matter of Arizona law, they have a right to pump groundwater. Everybody, I think, would agree, at least based on the decree, the district court doesn't have a right to stop them from pumping groundwater. Not arguing yet. Huh? I'm not arguing with you yet. So, at that point, the district court wasn't entitled to exercise jurisdiction over their claim to pump groundwater, and wasn't entitled to preclude them from pumping groundwater. That belonged in the adjudication. Actually, no. The adjudication is about Gila River water. The adjudication is about the water of the Gila River system and its tributaries. And that's right. You've got a right to groundwater wherever you go, whatever court. The problem here is the adjudication of the federal court says that some of what your client is pumping is Gila River water, and you've got no apparent right to Gila River water, and you're trying to suggest that you do, but I don't see it. I think what you're allowed to argue is that we're not pumping Gila River water, or that there should be another remedy. But I really don't see a basis for claiming that, gee, we weren't around in 1935, and so we didn't get to make this claim, which is pretty empty. Right. I'll stand on the ground that you can't enforce a consent decree against somebody who's not a party. But I agree with you. There's a genuine issue of material factor as to whether what we're pumping is river water or ground, I mean is subflow or groundwater. And based on Dr. Lipson's testimony, we're entitled to have our day in court. They're relying on a presumption that doesn't apply, and they're relying on evidence that is controverted. And at the end of the day, that's enough. They say to you that Smith stands for the proposition that a federal court has jurisdiction over a non-pumper. If you look at the Smith case, Judge Wright wrote that opinion has nothing to do with jurisdiction. I mean, Smith says, let's look at real science, which nobody has been doing for decades. I would be the first to admit that one of the challenges that everybody has here is that the Arizona law, and I think the Supreme Court has admitted this, probably isn't consistent with science, but it's consistent with the reality that that's been the Arizona law for as long as it's been available. It dates from a time before the science of today was available. I thought about starting my response to Mr. Sparks by saying he thinks science has to prevail. In the end, the Arizona Supreme Court has said law has to prevail, and it's going to ignore science on this question. I apologize for making you work overtime. Do you have any response on the overbreath? Yes, Your Honor. It is overbreath. Assume for a moment there's at least a genuine issue of material fact as to whether the wells are pumping 2%, 3%, 4% groundwater. I think by raising the issue that the injunction was overbreath before that court, that's sufficient to allow us to argue that the court should have entered a different injunction. But did you tell the court what it should have issued instead? I understand. You still want to contest the subfloor. But once the district court says, I think you're entitled to summary judgment, you can reasonably say, Your Honor, we respectfully disagree and we will talk to the Ninth Circuit about that, but assuming for purposes of the remedy that you are correct, we are only pumping at most 2.6% as sex to number one, and everything else is less than that, and therefore, if you're going to create a remedy, it ought to be X. Now, what did you propose? Your Honor, we have to go back and look. I haven't found anything in the time we were sitting here, but I want to go back and look at the whole record, and I'll supplement it, and if we didn't suggest anything, I'll file a letter with the court telling them, and if we did, I'll give you a policy. If you didn't suggest anything else, what are we supposed to do? I think what you're supposed to do is say to the court, on its face, this is an overbroad remedy. There's at least an issue of factor that we're only pumping 2%, and it's an overbroad remedy on its face, even if we didn't offer any other alternative to shut the wells down and shut these farms down entirely if we're pumping 2% subflow. I think you can do that, and I think you should do that. If the court has no further questions, I have nothing to add. Thank you, Your Honors. Thank you. Thank you, counsel, for your time and expertise this morning. Your arguments are very helpful. This case is submitted, and we are in recess until Friday morning.
judges: CLIFTON, BYBEE, BADE